WILHELMINA H. DAVIS *vs.* EDWARD T. TOBIN,

CATHERINE M. DAVIS *vs.* EDWARD T. TOBIN.

Aroostook.          Opinion, January 10, 1933.

*Bernard Archibald,*
*H. C. McManus,* for plaintiffs.
*J. Frederic Burns,* for defendant.

Sitting : Pattangall, C. J., Dunn, Sturgis, Barnes, Thaxter, JJ.

Barnes, J.   In the Superior Court three cases, the two here considered and that of Frank A. Davis, the driver of the automobile in which the plaintiffs here were injured in collision with defendant's car, were tried together.

The jury returned a verdict in favor of the defendant in the case brought by the driver, and verdicts for the plaintiffs here.

Defendant brings the plaintiffs' cases up on general motions for new trial, and on exceptions.

The two cases may be treated effectually in one opinion.

The accident occurred in Union Square of Houlton village, at about 11.30 a.m., on August 31, 1929.

Frank H. Davis was then and there driving a roadster, his daughter Catherine seated at his right, his wife in the rumble.

He crossed the iron bridge, so-called, moving then southerly and proceeded into Union Square, which is an enlargement of the Bangor road.

Union Square joins Market Square on the east, Kendall Street on the south, and the Bangor road westerly.

Mr. Davis testified that he had previously driven up the Bangor road into Market Square a dozen times, but that he had never entered Houlton, by U. S. Route 2, over the iron bridge before; that he started from a stop near the mouth of the bridge, and moving in second gear, climbed the slight rise that faced him, if he should enter Kendall Street, a continuation of the road he was then on, or should turn to his right to proceed out along the Bangor road.

The turn to run out along the latter road is practically a right hand turn, and in the angle, flush with the sidewalk on Union Square and the northerly margin of the Bangor road, a hotel building cut off his view to the west, until he was up the hill and in the Bangor road.

As he drove into this intersection of four streets, an automobile standing before the hotel building further limited his field of vision.

At this time the top of the roadster was down, and the daughter, on the right front seat, was talking with her mother in the rumble, presenting, as she sat, her back toward the door and Bangor road.

Defendant, just before the collision, drove his car, a Hudson coach, from a car service shop situated, as he testified, three hundred feet westerly from the point of collision, up the Bangor road.

He testified, and all witnesses agree, that he traversed the southerly, his right hand, portion of the street from a point seventy-five or eighty feet westerly of the point of collision until very near the car of plaintiffs.

He testified that as he approached the intersection of Kendall Street and the Bangor Road he saw a car emerging from Kendall Street: that he soon saw the Kendall Street car swerve easterly as if to proceed into Market Square, and then for the first time saw the roadster when he was thirty-five feet from it, and thirty feet from the point of collision.

His words were, "It seemed to me as if he was going down Bangor himself; so I didn't pay much more attention to him. I didn't watch him strike at all, I was watching the other fellow; and the next time I looked around I see then he was starting to go straight across the street. When he did I turned sharp to the left to avoid him. I see I couldn't go around behind him, so I slammed on the brake."

While the jury had the above for consideration they had also the testimony of Mr. Davis that, on the scene and at the time, "I asked him what in the world was the matter that made him run into me, and he said he never saw me. He said positively that he never seen me." Of two men who were near the cars when they came together, had unobstructed view, and who testified that they looked at defendant's car as it rolled to collision, called by defendant, one gave no testimony as to speed of defendant's approach, or slackening before impact, the other that the approach was at about twelve miles an hour and that he observed no slackening.

Two disinterested men who stood almost in the path of the roadster, in depositions, aver that defendant's close approach was at a speed between thirty-five and forty-five miles an hour, and that he did not slacken speed until the cars were in collision.

A woman, who was seated in the car that stood in front of the hotel building, in her deposition testified that defendant drove his car, "at a fast rate of speed, and he was looking at my car which was standing on the side of the street and he was not looking in the

direction in which he was going . . . the driver was looking at a monkey playing in my car."

Further testimony of defendant, in cross examination, reads,

"Q. And at the rate of speed you were travelling just before the collision, with the condition the car was in and the brakes, how far do you say your car would have travelled if you had put your brakes on when you deemed a collision imminent?

A. It wouldn't have went very far.

Q. How far in your opinion?

A. Oh, somewheres around a foot.

Q. You thought the Davis car was about stopping, you say?

A. Well, I thought he was either stopped or he was stopping right there.

Q. What made you think that?

A. He was coming in on my left and I supposed I was protected on that side.

Q. Don't you know whether the Davis car was in motion or standing still when you first saw it?

A. I didn't pay much attention to it.

Q. Then why do you say that you thought it was going to stop if you didn't pay any attention to it?

A. I thought it was either going to stop or turn and go down Bangor.

Q. What made you think that?

A. Because he was coming in on my left-hand side."

A right forward part of the coach hit the right rear wheel of the roadster, with sufficient force to throw the Davis passengers violently about, and both cars stopped.

The testimony quoted above, with all the other admissible testimony, not including such as was by deposition, would seem to justify the finding of negligence on the part of defendant.

Mrs. Davis testified that she saw the sedan and screamed just before the impact, and remembered no details of the collision until after it was over, and someone was presenting a glass of water to her.

Miss Davis was precipitated through the doorway, falling so that her head and shoulder struck the roadway, her feet not clearing the car, and lapsed into unconsciousness.

It is not disputed that both women were injured, and the amount of damages is attacked as excessive only in the case of the girl.

It is urged that Mrs. Davis was negligent because of what she saw of the approach of the coach, and because she failed to do anything to avert an accident, or gave no suggestion to the husband, who was driving.

She did not attempt by act to participate in the driving, a course certainly not required of a passenger in the rumble. She did not continue conversation regarding defendant's approach. "She naturally relied upon the judgment of her husband in driving the car. Accidents in driving automobiles are often quite as likely to happen as to be averted *by outcries* and unwarranted suggestions and interferences with the driver."

*Ward* v. *Clark*, 179 N. Y. Supp., 466, 18 A. L. R., 354.

But she did warn her driver.

In law both women were passengers, and no negligence of the driver is imputable to either of them, unless they severally failed to do what an ordinarily prudent passenger would have done in the face of similar conditions.

The testimony of Mrs. Davis on this point reads as follows:

"Well, I remember just as we came in the center of the street, almost the center, I suppose, I was looking around and I happened to look up the street to my right and I saw this car approaching very fast, and I said to my husband, 'Look at that car how it is coming.' He looked around and said, 'Oh, yes, but it's quite a distance from us.' Then I didn't think no more of it and turned to look the other way. Then as I turned again—I can't say how soon, not very long—I saw the car right near me.

Q. About how far away?

A. Well, I should say right up to there (indicating) or maybe a little nearer than that rail down there, the back rail (indicating rail in court room), and I screamed. As I did I saw the man in the car that was driving. He reached and he

seemed to be bewildered. He fumbled for something down below, I couldn't say what. Then the next thing I knew he struck us and I felt the car go up, and I thought we was gone, and that's all I remember."

At this point consideration of the exceptions to admission of depositions taken without the State is pertinent.

In the record we find this entry, made at the November term of the court below, 1931, Commission to issue to Conley, Esq., Boston, to take depositions of Mrs. Willard, Charles Allen and Henry Stone, in Mass., and that depositions were taken by or before the Commissioner named, upon interrogatories and cross-interrogatories filed by counsel on either side.

On trial, when the product of the commission to take depositions was offered, counsel for defendant objected to their admission, because, he said, before the issuance of the commission, counsel for the parties agreed that the Commissioner should notify the parties to the suits of time and place of taking the depositions, and that this was not done.

The position taken by counsel was properly presented to. the justice below, and decision of the issue raised was properly within the judicial discretion.

We find that all steps required by XXIV of the Rules of Court, relating to taking of depositions by order of Court were complied with.

And although by inadvertence, the Commissioner was not apprized of a suggestion that the parties be notified, the question whether a wise exercise of judicial discretion, on this single issue, justified the admission of the depositions is decided in the affirmative.

From all the evidence so far considered we approve the finding of the jury that neither passenger was guilty of negligence; and, hence, the amount of damages awarded Wilhelmina H. Davis not being in question the motion, in her suit, shall be overruled.

As we have said, Catherine Davis, the daughter, was not guilty of negligence.

She was seated with the driver engaged in conversation with her mother. She heard the warning, turned and looked toward de-

fendant's car, heard her father's rejoinder to the warning, and resumed the interrupted conversation. It seems from the evidence that defendant's speed must have been higher than estimated by the occupants of the roadster, and it seems that defendant did not decrease that speed after the roadster had arrived at mid-intersection of the streets. But the jury was justified in determining that the negligence, if any, on the part of an occupant of the roadster which contributed to the collision as a proximate cause was not the negligence of either passenger.

Two exceptions were noted and argued in the case of the daughter. The second, to the admission of the depositions, has already been disposed of.

The other pertains to the amount of damages awarded the daughter, eleven hundred twenty-five dollars.

The girl, on the day of collision, was eighteen years old.

Describing the position of his daughter, as she lay after the impact, Mr. Davis said, "Her feet were lying in the doorway of the car, her back was across the running-board of the car and her head was in the street."

Asked whether she had always theretofore been an ordinarily healthy girl, he answered, "Yes, she has been very rugged always," that she had never complained of pains; but that since the accident she has complained of severe pains during her menstrual periods.

The mother testified that previous to the collision plaintiff had been "in perfect health."

Pursuing this line of inquiry we read,

"Q. Your daughter Catherine has lived in your household all her life?

A. Yes sir.

Q. Will you tell us whether or not, previous to her leaving on this vacation, she was in good health?

A. Yes, sir, she was, I should say, in perfect health.

Q. Never seemed to have any pains?

A. No.

Q. Do you know whether or not previous to this accident she had pains at the menstrual periods?

A. No, sir.

Q. She never complained of any pains?

A. Not to my knowledge, no, sir.

Q. Do you know whether or not she has complained of pain since that time?

A. Yes, indeed, she has; very much so.

Q. Whether or not they have affected her work?

A. Yes, they have.

Q. (The Court.) In what way?

A. Well, your Honor, she has to be out usually two days each month, and her nervous condition too, besides.

Q. Are they particularly bad at the beginning of the period or the same all through?

A. Usually the first two days.

Q. So that she has to leave her work?

A. Yes, sir, she has to.

Q. And remains at home?

A. Remains at home and the nurse comes the next morning to see her.

Q. What nurse is that?

A. From where she is employed.

Q. How long ago was this accident?

A. Well, it was two years last August.

Q. Do you say that this complaint of pain at the menstrual period has continued up to the present time?

A. Yes, sir, is has so."

The daughter testified that prior to the accident she had been in good health, and had felt during her periods of menstruation only the minimum of discomfort, but that shortly after the collision the normal menstrual function was impaired; her periods were irregular in time; the pains, "quite intense;" that when they begin on a working day, she goes to the hospital maintained for its employees by the Insurance Company for which she works, is there given medicine, and is forced to go to her home and remain there for a day, at times two days, and that up to the time of the trial, twenty-nine months after the accident, "each time it (the pain) is just as bad."

No other witness as to her physical condition was introduced, except a physician, introduced by the defendant.

After having been informed of the condition complained of, speaking as an expert, the doctor testified that the condition might persist for two years or longer but that he would not expect it to.

Asked to what he would attribute the disturbance and irregularity described he replied "to a nervous condition"; and he frankly stated that he would connect the accident with that condition.

This phase of the case is dwelt on thus fully as it bears also on the propriety of finding damages as great as the jury found.

The exception was noted to the exclusion of the following, in cross examination, "Do you know of any of your friends who, when these periods come around, leave their work and are away?"

Foundation, to justify the introduction of this question, if it might ever become admissible, would invoke complete physiological knowledge of so many individuals, and all finally to no convincing end, as to protract the trial beyond reason.

The decision was within the province of the Court, and was right.

When the amount of damages, in cases such as that of the young woman here, is to be assessed a troublesome question arises.

Injury established, she may recover for the undoubted shock of the accident, and for all the sufferings, mental and physical, which it caused; for loss of health and for loss due to diminished or interrupted earnings, past and future.

"For the endurance of the nervous condition caused by her injuries she is entitled to compensation. Such suffering may be both mental and physical.

"There is no standard by which the damages for such injuries as are shown in this case can be measured. In the end the question must be left to the sound sense and good judgment of the jury, to award such damages as seem to them to be fairly compensatory. And when it appears that the jury have discharged their duty with fidelity, and have reached a reasonable approximation of the damages, the court will not interfere even though the verdict should seem to them somewhat large. When the verdict is within the bounds of reason, the court will not institute a paring process to make it conform more exactly to their own views." *Felker* v. *Bangor Railway and Electric Company*, 112 Me., 255, 91 A., 980, 981.

So here it is not for the Court to say that the damages recovered are excessive, since the uncontradicted testimony shows an ab-

normal condition causing frequently recurring days of pain and inactivity, pain described as not less intense than when first suffered, and which the jury may have reasonably decided as probably to be endured periodically for some time in the future.

*Exceptions and Motions overruled.*